**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAYANT C. BHALERAO, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 11-CV-7558 |
| | ) | |
| ILLINOIS DEPARTMENT OF FINANCIAL | ) | Judge Robert M. Dow, Jr. |
| AND PROFESSIONAL REGULATIONS, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff Jayant Bhalerao, M.D.'s motion for preliminary injunction. For the reasons set forth below, the motion is respectfully denied.

**I.      Background**

Plaintiff Jayant Bhalerao has been licensed as a physician in Illinois since 1973, specializing in cardiology and internal medicine. For the past ten years, he has practiced medicine at a clinic in Orland Park, Illinois, where he sees approximately 10-15 patients per day. In 1999, a patient accused Dr. Bhalerao of inappropriately touching her during an examination, and the Henry County State's Attorney charged him with one count of criminal sexual abuse and one count of misdemeanor battery related to that accusation. Dr. Bhalerao entered a plea of not guilty and testified on his own behalf at trial. On June 27, 2000, a jury acquitted Dr. Bhalerao of the criminal sexual abuse charge, but returned a guilty verdict on the charge of misdemeanor criminal battery. Plaintiff did not appeal the conviction. Dr. Bhalerao has never been convicted of a sex offense. Following the verdict, Dr. Bhalerao was ordered to pay a fine of $2,500.00. The court did not impose any additional punishment as part of his sentence, such as

imprisonment, probation, or community service, nor was Dr. Bhalerao required to register as a sex offender.

On September 19, 2000, the Illinois Department of Financial and Professional Regulation ("IDFPR"), which is charged with issuing, renewing and disciplining professional licenses, including health professionals, filed a disciplinary action against Dr. Bhalerao, charging him with "unprofessional conduct" under the Medical Practice Act. See 225 ILCS 60/22(A)(5). In July 2002, Dr. Bhalerao and the Medical Disciplinary Board entered a Stipulation and Recommendation for Settlement and submitted that recommendation to the Director. On December 30, 2002, the Acting Director of IDFPR entered an order (the "2002 Order") adopting the recommendation, which reprimanded Dr. Bhalerao's license and required him to have a chaperone present whenever he examined a female patient. Dr. Bhalerao has complied with the conditions of the 2002 Order, and his license has remained in good standing and active status since 2002. The reprimand resulting from the 2002 Order is the only discipline on Dr. Bhalerao's record.

Effective August 20, 2011, the Illinois General Assembly added a new section, 20 ILCS 2105/2105-165, to the Civil Administrative Code of Illinois. Section 2105-165 mandates the permanent revocation of the licenses of health care workers in certain circumstances. Section 2105-165 provides in pertinent part:

> (a) *When a licensed health care worker*, as defined in the Health Care Worker Self-Referral Act, (1) has been convicted of a criminal act that requires registration under the Sex Offender Registration Act; (2) *has been convicted of a criminal battery against any patient in the course of patient care or treatment*, including any offense based on sexual conduct or sexual penetration; (3) has been convicted of a forcible felony; or (4) is required as a part of a criminal sentence to register under the Sex Offender Registration Act, then, notwithstanding any other provision of law to the contrary, *the license of the health care worker shall by operation of law be permanently revoked without a hearing.*

2

20 ILCS 2105/2105-165 (emphasis added).  On October 7, 2011, Dr. Bhalerao received a Notice of Intent to Issue Permanent Revocation Order ("Notice") from the IDFPR, notifying him that his medical license was to be revoked because of a "[c]onviction of a criminal battery against a patient in the course of patient care or treatment."  The Notice provided Dr. Bhalerao with the opportunity to challenge the revocation for three reasons:  (1) that he was incorrectly identified as the person with the conviction; (2) that the conviction has been vacated, overturned, or reversed, or a pardon has been granted; or (3) the conviction was not a disqualifying conviction.  Dr. Bhalerao concedes that none of these defenses apply to him.  The Notice indicated that it would become effective 20 days from its date (October 5, 2011) or on October 25, 2011.

Dr. Bhalerao filed his complaint and a motion for temporary restraining order on October 24, 2011.  On October 25, 2011, the Court entered a temporary restraining order ("TRO") [11], which expired in the first instance on November 8, 2011.   The Court entered an order [21] on November 8 extending the TRO for "good cause" shown until November 22, 2011.  The TRO has been extended by agreement of the parties until November 29, 2011, to allow the Court time to issue its written ruling after taking full briefing and oral argument.  On November 2, 2011, Dr. Bhalerao filed an amended complaint and motion for preliminary injunction.  Plaintiff claims that § 2105-165 is unconstitutional because it violates his rights to procedural and substantive due process, it violates the "Contracts Clause," and it violates constitutional prohibitions against *ex post facto* laws and laws that result in double jeopardy.  Plaintiff also argues that revocation of his license is barred by the statute of limitations set forth in a separate statute (the Medical Practice Act) and *res judicata*.

## II.      Standard for Preliminary Injunction

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); see also *Goodman v. Ill. Dep't of Financial & Professional Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (same). To justify a preliminary injunction, Plaintiff must show that he is "likely to succeed on the merits" of his claims, that he is likely to suffer irreparable harm without an injunction, that the harm he would suffer without the injunction is greater than the harm that preliminary relief would inflict on Defendants, and that the injunction is in the public interest. *Michigan v. U.S. Army Corps of Engineers*, 2011 WL 3836457, at *2 (7th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

If the moving party meets its initial burden, then the court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). The court also considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*; see also *Winter*, 129 S. Ct. at 376-77 ("courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"). The court weighs all of these factors, "sitting as would a chancellor in equity" (*Abbott*, 971 F.2d at 12) and applying a "sliding scale" approach, under which "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." *Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001). As the Seventh Circuit has stressed, "[t]he sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as

subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Id* at 895-96 (quoting *Abbott Labs*, 971 F.2d at 12).[1]

Here, Plaintiff has met his burden of demonstrating that he is likely to suffer irreparable harm without an injunction and that the harm he would suffer without the injunction is greater than the harm that preliminary relief would inflict on Defendants. Specifically, he has demonstrated that he has an ascertainable right in his medical license. See *Smith v. Department of Registration and Ed.*, 106 N.E.2d 722, 726 (Ill. 1952) ("It has been universally held that a license to practice medicine is a 'property right,' within the meaning of the constitutional guarantees of due process of law."). He also has shown that without an injunction, he will suffer irreparable harm from being unable to continue in his career as a physician. Finally, he has demonstrated that he has no adequate remedy at law in this matter, because monetary damages fall short of remedying the loss associated with the revocation of his medical license and the end to his chosen occupation. Because Dr. Bhalerao has met his burden with respect to these elements, the Court moves expediently to the primary concern—whether Plaintiff has any chance of success on the merits.

## III. Analysis

### A. Likelihood of Success on the Merits

#### 1. *Substantive due process challenge*

Plaintiff primarily advances two substantive due process arguments. First, Plaintiff contends that § 2105-165(a) has been applied retroactively as to him. And second, Plaintiff maintains that § 2105-165(a) deprives him of a recognized property interest without a rational

---

[1] Even if a district court decides that the moving party has not satisfied one of the threshold requirements for a preliminary injunction, the court of appeals has urged the district court "to conduct at least a cursory examination" of all of the factors, both to expedite appellate review and to protect the interests of the parties. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of America, Inc.*, 549 F.2d 1079, 1087 (7th Cir. 2008).

basis.  See, *e.g.*, *General Auto Svc. Station v. City of Chi.*, 526 F.3d 991, 997 (7th Cir. 2008) (analyzing both types of claims under substantive due process).  Substantive due process protects fundamental liberty interests against infringement by the government. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993); *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  In this case, no fundamental right is at issue (see *Dittman v. State of Cal.*, 191 F.3d 1020, 1031 n.5 (9th Cir. 1999) (noting that Supreme Court has never recognized fundamental right to pursue one's chosen occupation)); however, Plaintiff has stated a "generalized" liberty interest in pursuing his chosen field (see *id*. at 1029) (noting that early Supreme Court cases suggested such an interest). Because a fundamental right is not involved, substantive due process requires only that "the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary or irrational."  *General Auto Svc.*, 526 F.3d at 1000 (quoting *Lee v. City of Chicago*, 330 F.3d 456, 461 (7th Cir. 2003)); see also *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 239 (1957) (noting that state may legitimately set requirements for occupational qualification, but such requirements "must have a rational connection with the applicant's fitness or capacity to practice").

With regard to retroactivity, Plaintiff's argument assumes that a statute that relies in part upon antecedent facts—such as his earlier criminal battery conviction—necessarily operates retroactively (or retrospectively).  However, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, [] or upsets expectations based in prior law.  Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products*, 511 U.S. 244, 269-270 (1994).  Thus, "[a] statute is not made retroactive merely because it draws upon antecedent facts for its operation." *Cox v. Hart*, 260 U.S. 427, 435 (1922);

see also *Reynolds v. United States*, 292 U.S. 443, 449 (1934) ("A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends * * * are drawn from a time antecedent to the enactment.").

The Seventh Circuit's recent decision in *United States v. Leach* is instructive. In *Leach*, the court upheld the Sex Offender Registration and Notification Act ("SORNA"), a law that requires sex offenders to register in every jurisdiction in which they live, work, and attend school, notify government officials when changing residence, and provide personal identifying information. *United States v. Leach*, 639 F.3d 769 (7th Cir. 2011). The court identified Leach's complaint in terms that mirror an argument advanced by Dr. Bhalerao: that the law at issue "effectively increases the punishment" for the prior offense. The court recognized that SORNA "imposes significant burdens on * * * offenders who * * * may have committed their crimes and completed their prison terms long before the statute went into effect" but also noted that the law targeted "only the conduct undertaken by convicted sex offenders after its enactment." The court further clarified that, although "[a]ll of these requirements are triggered without respect to the date of the convictions," even "that does not make them retrospective: SORNA merely creates new, prospective legal obligations based on the person's prior history." *Id.* at 773.

Here, even though the General Assembly clearly intended § 2105-165(a) to be used to revoke health care licenses of individuals who had been convicted of certain offenses prior to the effective date of the new statute, it is not being applied retroactively as that term is understood in the case law. In other words, while § 2105-165 applies to convictions that predate the statute, it is not retrospective. Like the statute at issue in *Leach*, § 2105-165 is "triggered without respect to the date of the convictions" (see *Leach*, 639 F.3d at 773), but that alone does not make it retroactive. To be sure, § 2105-165 "draws on antecedent facts for its operation" (*Cox*, 260 U.S.

at 435), but it does not impose "new legal consequences" to "completed events" such as Plaintiff's conviction or his practice of medicine in the years since that conviction. Rather, the statute looks prospectively at Plaintiff's right to continue practicing medicine in the future. See also *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (characterizing deportation as "look[ing] prospectively to the respondent's right to remain in this country in the future"). It does not impinge on the right that Plaintiff had in the preceding years to practice—for example, by divesting him of any profits that he earned prior to its enactment or deeming unauthorized his practice of medicine during the time between his conviction and the revocation of his license. Put another way, the statute "creates present and future effects on present and future conduct, and has no effect on past conduct." *Collins v. Montgomery County Bd. of Prison Inspectors*, 176 F.3d 679, 684 (3d Cir. 1999).

This analysis is supported by the Seventh Circuit's observation that "[i]t would border on the absurd to argue that these aliens might have decided not to commit drug crimes, or might have resisted conviction more vigorously, had they known that if they were not only imprisoned but also, when their prison term ended, ordered deported, they could not ask for a discretionary waiver of deportation." See *LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir. 1998) (upholding a law removing the possibility of discretionary relief from deportation for alien convicts). Plaintiff was found guilty of criminal battery against a patient and did not rely on any law that would provide him the possibility of better results if he decided to forego an appeal. Rather, during the pendency of the criminal trial through the decision not to appeal, Plaintiff's license was subject to revocation at the discretion of IDFPR (under the Medical Practice Act)[2] due to his conduct and conviction. The reasoning of the court in *LaGuerre* applies here in that it seems

---

[2] The Medical Practice Act, which was in effect at all relevant times, permitted IDFPR, in its discretion, to revoke Plaintiff's license for his conduct. See 225 ILCS 60/22(A)(5).

superficial to argue that Plaintiff "might have decided not to commit" the battery "or might have resisted conviction more vigorously" had he known that he faced not only criminal penalties but also might not be entitled to the exercise of the IDFPR's discretion in regard to whether his license would be revoked. In fact, by the time that the IDFPR filed its 2000 complaint against Plaintiff that could have—but did not—result in the revocation of his license, the time for appealing Plaintiff's conviction already had passed without the filing of a notice of appeal.

Plaintiff also contends that § 2105-165(a)'s revocation of his license runs afoul of the substantive due process requirement that "the practice be rationally related to a legitimate governmental interest * * *." *General Auto Svc*., 526 F.3d at 1000 (quoting *Lee v. City of Chicago*, 330 F.3d 456, 461 (7th Cir. 2003)); see also *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 239 (1957). The Court respectfully disagrees. All that Defendants need show is a "conceivable" rational basis for statute, which is readily discernable. The General Assembly's interest in regulating the medical profession and protecting the public from health care workers who have been convicted of battery against their own patients cannot seriously be questioned. For more than a century, courts consistently have upheld statutes that withhold or revoke occupational licenses for failure to meet or comply with conditions imposed by the state for societal protection. See, *e.g., Dittman*, 191 F.3d at 1030-31; *Abramson v. Gonzalez*, 949 F.2d 1567, 1580-81 (11th Cir. 1992) (upholding statute requiring professionals to have state license before holding themselves out as psychologists); *Wineblad v. Dep't of Educ. & Regis*, 515 N.E.2d 705, 709 (Ill. App. Ct. 1st Dist. 1987) (holding that applying a new statutory licensing requirement of taking a certifying exam to previously licensed nurses was not an improper retroactive application of the statute) (citing *Rios v. Jones,* 63 Ill.2d 488 (1976); *Brown v. McGarr*, 774 F.2d 777 (7th Cir. 1985)). Furthermore, courts have upheld statutes that require or

allow revocation of professional licenses after a licensee has been convicted of a crime. See, *e.g.*, *Hawker*, 170 U.S. 189 (upholding statute forbidding felons from practicing medicine after discussing general power of states to regulate professions, including requiring good character and determining what evidences a lack of good character); *Weiss v. N.M. Bd. of Dentistry*, 798 P.2d 175, 180 (N.M. 1990) (noting that permitting revocation of license on basis of criminal conviction "also reflects a legislative policy that public confidence in practitioners of a profession should not be undermined by the licensing of convicted felons" and that "it is within the legislative prerogative, in defining 'the qualifications one shall possess in order to engage in the practice of dentistry' [] to prescribe the conditions under which the privilege [] or the 'property right' [] of so practicing shall be enjoyed") (internal citations omitted); *Warmouth v. Del. State Bd. of Examiners in Optometry*, 514 A.2d 1119 (Del. Super. 1985) (affirming statute under which "conviction of a crime may be the sole basis for revocation of a license").

In short, as the foregoing cases demonstrate, professional licenses always have been subject to regulation. Moreover, the Illinois Supreme Court has noted that the General Assembly has not only the right, but also the "duty to require that medical license applicants possess good moral character." *Abrahamson v. Ill. Dept. of Prof. Reg.*, 606 N.E.2d 1111, 1118 (Ill. 1992). The legislature's interest in regulating the medical profession and protecting the public from health care workers who have been convicted of batteries against their own patients is rationally related to § 2105-165(a)'s license revocation for convicted professionals. The best that can be said for Plaintiff's position is that application of the statute in the particular (and in all likelihood atypical) circumstances of this case leads to a harsh result. Here, we have a Plaintiff who previously escaped revocation of his license following a criminal battery conviction after thorough vetting by the appropriate regulators and continued to practice medicine for a decade

since. The Court does not doubt that Dr. Bhalerao would be a strong candidate for a discretionary waiver of the revocation statute if such a waiver were authorized. But the General Assembly has now made mandatory what previously was discretionary, stripping away from its creation (the IDFPR) the authority to treat misdemeanants like Dr. Bhalerao more leniently than others who fall within the ambit of § 2105-165. In so doing, the General Assembly has drawn a bright line[3] and cast a wide net.

To the extent that the Court might favor a regime that blurred the line or narrowed the scope of the new law through continued agency discretion, the Court must remain cognizant that the General Assembly is the primary expositor of Illinois public policy and is given wide latitude in making classifications and drawing lines, especially in the exercise of its prerogatives concerning public health, safety, and welfare. See, *e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 83 (1976) (noting that "it remains true that some line is essential [and] that any line must produce some harsh and apparently arbitrary consequences * * * * When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment."); *City of Chicago v. Shalala*, 1998 WL 164889, at *12 (N.D. Ill. Mar. 31, 1998) ("Congressional line drawing necessarily implies that people with differing circumstances will be placed on either side of the line. This court is not empowered to second-guess Congress' decision as to where to place that line") (internal citations omitted). Put another way, the Court—indeed, any court— may not second-guess the legislature's judgment so long as it has a rational basis. Here, the statutory language itself directly links revocation of the medical license and some kind of criminal misfeasance during the course of patient care or treatment. At the level of generality at

---

[3] Plaintiff appeared in his complaint to contend that the line drawn was not so bright, because the statute was intended to apply to sexual predators, not to persons (like Plaintiff) who committed only a misdemeanor criminal battery. However, in response to the Court's repeated probing of the issue, Plaintiff has acknowledged that his conduct clearly falls within the scope of the mandatory statutory revocation and that any attempt to argue otherwise, either to the agency or the Court, would be futile.

which it is written, the rational basis for the statute is self evident from its plain text. And the fact that the statute covers tough cases that lie at the margins of its reach—like this one—does not alter the rational basis inquiry. For all of these reasons, Plaintiff lacks a negligible chance of success on the merits of his substantive due process challenge.

### 2. *Procedural due process challenge*

Plaintiff also argues that the procedure provided in § 2105-165(a) is invalid as applied to him on procedural due process grounds. In contrast to substantive due process claims, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir. 1990); see also *Brokaw v. Mercer County*, 235 F.3d 1000, 1020-21 (7th Cir. 2000). Thus, a procedural due process claim involves a two-part analysis: First, a court looks at whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then the court must assess what process was due. See *Hamlin v. Vaudenberg,* 95 F.3d 580, 584 (7th Cir. 1996); *Brokaw*, 235 F.3d at 1020; *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010) ("To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law.").

In this case, Plaintiff has alleged a liberty interest in his employment. "The concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn,* 965 F.2d 452, 455

(7th Cir. 1992) (citing *Lawson v. Sheriff of Tippecanoe County,* 725 F.2d 1136, 1138 (7th Cir. 1984)). The Due Process Clause of the Fourteenth Amendment does not make the denial of a liberty interest actionable; it only makes the denial of a liberty interest *without due process* actionable. "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Accordingly, when the risk of revoking a license erroneously is very low and the government's interest in revocation is high—and it typically is considered high when it acts to protect the public—a hearing prior to revocation may not be necessary. *Gilbert*, 520 U.S. at 930-31 (holding no pre-deprivation hearing necessary for suspension for employee who was charged with felony); *People ex rel. Eppinga v. Edgar*, 492 N.E.2d 187, 190-91 (Ill. 1986) (no hearing in revocation of drunk drivers' license was necessary when risk of erroneously revoking the license was low and the government interest in revocation was high); see also *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976); *McGarr*, 774 F.2d at 784 -785.

Here, the risk that Plaintiff's license is being revoked erroneously is remote. Plaintiff admits the only facts required for revocation under § 2105-165(a)—that he is a licensed physician in Illinois and that he has been convicted of criminal battery against a patient in the course of treatment or care. And he also concedes that he cannot challenge the revocation on the only factual bases possible under § 2105-165: (1) that he was incorrectly identified as the person with the conviction; (2) the conviction has been vacated, overturned, reversed, or a pardon has been granted; or (3) the conviction at issue is not a qualifying conviction under the statute. Because Plaintiff has conceded all facts necessary for revocation of his license and also admits that he does not fall within any recognized exception, a hearing would not benefit him. By

contrast, "[i]n establishing the requirements for licensing health care professionals," the State's interests "are of great importance." *Wineblad*, 515 N.E.2d at 709

It also bears noting that Plaintiff received due process in the underlying criminal action. Section 2105-165(a) requires that prior to revocation, the licensee must have been *convicted* of one of the criminal offenses listed. A criminal conviction has been described as "conclusive evidence" of both bad character and that the convict committed the offense. See *Hawker*, 170 U.S. at 196 ("[I]f [the legislature] may make a violation of criminal law a test of bad character, what more conclusive evidence of the fact of such violation can there be than a conviction duly had in one of the courts of the state?"); *S.C. State Bd. of Dental Examiners v. Breeland*, 38 S.E.2d 644, 649 (S.C. 1946) (holding that conviction was "conclusive evidence" that respondent committed the offense); *Smith v. Sheahan*, 959 F. Supp. 841, 845 (N.D. Ill. 1997) (noting that in Illinois "disciplinary proceedings, a conviction is conclusive evidence that the attorney has committed acts that subject him or her to discipline; the court will not go behind the conviction"). Plaintiff does not claim an absence of due process at the criminal trial and in fact concedes that he pleaded not guilty and testified at trial in his own defense.

In short, taking into account all of the factors that inform the due process analysis, the Court concludes that Plaintiff has been accorded all of the process that is due—both in regard to his underlying conviction and the current revocation proceeding. The fact that Plaintiff does not have a viable basis for invoking the administrative review process under § 2105-165(a) does not alter the analysis. Nor is there any basis upon which Plaintiff can demand as a matter of due process the exercise of agency discretion where the General Assembly has acted to remove any such discretion to advance its public policy goals. Simply put, Plaintiff does not have any

chance of success on the merits of his claim that § 2105-165(a) violates his right to procedural due process.

### 3. Double Jeopardy

Plaintiff also maintains that revocation of health care licenses under § 2105-165(a) for criminal convictions violates the prohibition against double jeopardy under both the federal and state constitutions. See, *e.g.*, *People v. Levin*, 623 N.E.2d 317, 327-28 (Ill. 1993) (the double jeopardy clause of our state constitution is to be construed in the same manner as the double jeopardy clause of the federal constitution); *In re P.S.*, 676 N.E.2d 656, 662 (Ill. 1997) (same). "The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). "The protection against multiple punishments prohibits the Government from punishing twice, or attempting a second time to punish criminally for the same offense." *United States v. Ursery*, 518 U.S. 267, 273 (1996). To determine whether a license revocation is punishment for purposes of the double jeopardy clause, courts consider whether the General Assembly intended the proceedings to be civil. See *Cox v. Commodity Futures Trading Comm'n*., 138 F.3d 268, 272 (7th Cir. 1998) ("The first step in our analysis is to determine whether the legislature in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other") (quotations omitted). If so, courts assess whether the proceedings are nevertheless so punitive that the proceedings may not be legitimately viewed as civil in nature despite the General Assembly's intent. *Id*. ("Turning to the second stage of analysis, we must determine whether, notwithstanding this legislative preference, the sanction operates in such a way as to transform it into a criminal penalty.").

Here, the General Assembly included § 2105-165 in the Civil Administrative Code, rather than in the Criminal Code, 720 ILCS 5/1-1 *et seq.* It was drafted as an agreed bill between the State Medical Society and the Illinois Coalition against Sexual Assault (see 97th General Assembly, Debate of HB 1271 (Third Reading), 4/11/2011) and appears to have been precipitated at least in part by a Chicago Tribune investigation revealing that 16 doctors who had been convicted of sex offenses were still licensed to practice. In addition to the mandatory license revocation discussed above, the new law requires chaperones and notification to patients for licensed health care workers who have been charged with, but not yet convicted of, such a crime. 20 ILCS 2105/2105-165(c). Based on the Court's assessment of these circumstances, it seems clear that the legislative purpose behind the statute is civil—to protect public health, safety, and welfare—and not to impose additional punishment for these health care workers' crimes.

Turning to the second inquiry, in determining whether a statute has a punitive effect, notwithstanding the General Assembly's civil intent, the court's inquiry is structured according to the seven factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). See *Cox v. Commodity Futures Trading Comm'n.*, 138 F.3d at 272. Those factors are: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment, retribution, and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Mendoza-Martinez*, 372 U.S. at 168-69; see also *People v. Malchow*, 193 Ill.2d 413 (2000). In *Cox*, the Seventh Circuit

considered whether an administrative sanction by the Commodity Futures Trading Commission revoking the plaintiff's floor broker registration and permanently barring him from trading in markets regulated by the Commission constituted double jeopardy for his criminal conviction for the same activities. The court determined that the revocation did not constitute double jeopardy. The current situation presents a similar scenario in which the State seeks to revoke Plaintiff's medical license for criminal behavior; thus, the analysis conducted by the Seventh Circuit in *Cox*, following the Supreme Court in *Hudson v. United States*, 522 U.S. 93 (1997), is instructive.

First, with respect to whether the "sanction" involves an affirmative disability or restraint, the *Cox* court explained that this occurs when "the sanction in question smacks of the infamous punishment of imprisonment." *Cox*, 138 F.3d at 272-73 (citing *Hudson*, 522 U.S. at 99-103). The court found that "[w]hile a registration revocation certainly keeps respondent from engaging in certain activities, it does not approach the infamous punishment of imprisonment." *Id.* at 273. Similarly, § 2105-165 is limited to the revocation of health care professionals' licenses and is not akin to the far more serious punishment of imprisonment. This observation is not meant to diminish the seriousness, particularly to Dr. Bhalerao, of license revocation. Nevertheless, even after the new law is applied to Dr. Bhalerao, there will be no restraints on his liberty and he will be legally free to pursue any line of work that does not require a medical license.

Second, the revocation of a voluntarily granted privilege, like a license, is not something that courts have regarded as a punishment. See *Hudson*, 522 U.S. at 104 (recognizing that "revocation of a privilege voluntarily granted * * * is characteristically free of the punitive criminal element") (internal quotations omitted). Instead, changing the requirements for licensure in Illinois has historically been viewed as a civil determination for the protection of the public, rather than as a criminal penalty. "License revocation is not a criminal prosecution and is

neither a judgment of the illegality of such acts nor the infliction of a punishment for them * * * * Thus, revocation of a professional license is not a criminal sanction * * *." *Rasky v. Department of Registration & Ed.*, 410 N.E.2d 69, 74-79 (Ill. App. Ct. 1st Dist. 1980) (internal citations omitted); see also *Roach Enterprises, Inc. v. License Appeal Comm'n. of City of Chicago*, 660 N.E.2d 276, 282 (Ill. App. Ct. 1st Dist. 1996) ("the revocation of a liquor license for violating the conditions of its issuance does not constitute punishment for purposes of the restriction on double jeopardy"); *People v. Lavariega*, 676 N.E.2d 643 (Ill. 1997) (holding that summary suspension of a defendant's driver's license was not punishment for purposes of state and federal double jeopardy clauses).

The third *Kennedy* factor asks "whether the sanction comes into play only on a finding of scienter." The Sex Offender Act appears to come into play upon a finding of scienter, which is a necessary element of each of the crimes identified in the Sex Offender Act, including misdemeanor battery. See 720 ILCS 5/12-3 ("[A] person commits battery if he (or she) intentionally and knowingly without legal justification and by any means causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual."); see also *Cox*, 138 F.3d at 273 (looking at whether the relevant crimes require scienter). This factor weighs in favor of Plaintiff.

The fourth factor asks whether the operation of the sanction will promote the traditional aims of punishment such as retribution and deterrence. Even if § 2105-165 acts as a deterrent in some cases, this does not necessarily transform the penalty from civil to criminal. "While revoking a person's registration will likely deter the transgressor and others from future illegal conduct, the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals." *Cox*, 138 F.3d at 273 (quoting *Hudson*,

522 U.S. at 104). As noted by the Illinois Supreme Court, "it is unlikely that those not already deterred from committing sex offenses by the possibility of a lengthy prison term will be deterred by the additional possibility of community notification. Moreover, even an obvious deterrent purpose does not necessarily make a law punitive." *People v. Malchow*, 739 N.E.2d 433, 440 (Ill. 2000) (citing *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 780 (1937)). Here, Plaintiff's license was already subject to possible revocation for his criminal conviction, and thus the change in the law—from discretionary revocation to mandatory revocation—does not appear to have been intended as an additional deterrent or retribution. Rather, the aim primarily serves the civil goal of protecting the integrity of the medical profession.

With respect to the fifth factor, § 2105-165 applies only to behavior that is already criminal. Thus, this factor weighs in Plaintiff's favor. See also *Malchow*, 739 N.E.2d at 440. However, as noted by the court in *Cox*, "[t]his fact is insufficient to render the * * * sanctions criminally punitive * * * particularly in the double jeopardy context." 138 F.3d at 273 (quoting *Hudson*, 522 U.S. at 105).

The final two *Kennedy* factors—whether there is an alternative purpose for the sanction and whether the sanction appears excessive in relation to the alternative purpose assigned—lend themselves to consideration together. The Seventh Circuit has described "alternative purpose" to mean a purpose other than a punitive purpose. *Cox*, 138 F.3d at 273-74. In this case, the alternative purpose for the sanction appears to be the "actual intended purpose," which is to protect public health, safety, and welfare and ensure the integrity of a professional field. *Id.* However, the seventh factor—whether the sanction appears excessive in relation to the alternative purpose assigned—is not so easily slotted. It is true, as Defendants repeatedly point

19

out, that Illinois courts have found that in establishing requirements for licensing health care professionals, "the State's interests are of great importance." *Wineblad*, 515 N.E.2d at 709. Certainly, preventing sex offenders, and even others with criminal convictions arising out of patient conduct, from having access to patients advances the goal of protecting public health, safety, and welfare. But whether that sanction is excessive, particularly given the present circumstances, is not so easily decided. The court in *Cox* repeatedly stressed the fact that the statute at issue only created a presumption that a person was unfit for registration and that the Commission retained the discretion to grant the registration if the registrant shows that he does not pose a threat to the market. *Cox*, 138 F.3d at 273-74. The court also pointed out that revocation was not the only option available to the Commission and that the Commission had the discretion to register conditionally, suspend, or place restrictions on the registration of any person found to have been convicted of a felony or to have engaged in the requisite behavior. *Id.* In concluding, the court specifically noted that "[b]ecause the Commission is charged with protecting the integrity of the markets, *and it has discretion regarding the appropriate sanction*, §§ 8a(2)(D) and (E) do not create an 'excessive' sanction." Cox, 138 F.3d at 273-74.

Here, when the IDFPR had discretion, it found that Dr. Bhalerao was fit to practice medicine (albeit with a chaperone present whenever he examined a female patient). Dr. Bhalerao has complied with the conditions of the 2002 Order. His license has remained in good standing and active status since 2002, and the reprimand resulting from the 2002 Order is the only discipline on Dr. Bhalerao's record. Now, the IDFPR no longer has discretion regarding the appropriate sanction, resulting in the imminent revocation of Dr. Bhalerao's license to practice medicine. These facts render this case distinguishable from *Cox*—and more favorable to Plaintiff—in regard to the seventh factor.

Although some of the *Kennedy* factors (the third, fifth, and seventh) favor Plaintiff, on balance the Court cannot conclude that § 2105-165 operates in such a way as to transform it into a criminal penalty. Revoking the licenses of doctors who have been convicted of battering a patient in the past certainly helps to protect the welfare of future patients. Indeed, there are clear, non-punitive goals advanced by the statute:

> The practice of medicine in Illinois is lawfully prohibited by the State except on the conditions it imposes, and the State's legitimate concern for maintaining high standards of professional conduct extends beyond the initial licensing. The practice of medicine, in addition to skill and knowledge, requires honesty and integrity of the highest degree, and inherent in the State's power is the right to revoke the license of those who violate the standards it set.

*Kaplan v. Department of Registration and Ed.*, 361 N.E.2d 626, 631 (Ill. App. Ct. 1st Dist. 1977). In *Kaplan*, the Illinois Appellate Court ruled that revoking a doctor's medical license for the conviction of a crime was "not a second criminal proceeding placing the physician in double jeopardy." *Kaplan v. Department of Registration and Ed.*, 361 N.E.2d 626, 631 (Ill. App. Ct. 1st Dist. 1977). Rather, the court found the purpose to be "to maintain sound, professional standards of conduct for the purpose of protecting the public and the standing of the medical profession in the eyes of the public * * * * It has long been the law that the conviction of a criminal offense or felony is a sufficient ground for revocation of a physician's license, even where the offense is not related to the professional itself * * *." *Id.*

The protection of the public from healthcare professionals who have been convicted of the listed crimes provides a non-punitive goal for § 2105-165: allowing convicted healthcare professionals to continue to practice would give them access to patients and patient information, after they have already been found to have violated a patient's trust. Illinois courts have recognized the special trust relationship between a patient and healthcare professional:

> A person who would flee from a needle-wielding stranger on the street willingly rolls up his sleeve for his needle-wielding doctor because he trusts him * * * * Patients are at no higher risk of being sexually assaulted in general, but they are at an infinitely higher risk of being assaulted under the pretext of care or in the course of an otherwise legitimate medical examination. This hospital sexual assault differs fundamentally from a situation in which a doctor sexually assaults a patient on the street, or in a bar, or in the hallway leading to his office. The potential for sexual abuse in the modern medical setting is evinced by the extreme pains conscientious health-care providers take to ensure they will never be accused of it.

*Kaufmann v. Jersey Community Hosp.*, 919 N.E.2d 1077, 1094-95 (Ill. App. Ct. 4th Dist. 2009).

In sum, although certain factors suggest that the sanction at issue is a "criminal" one, in light of the circumstances as a whole, those factors are insufficient to "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99. In the face of legislative intent and the language of Illinois courts' regarding the special trust relationship between a patient and a physician and the high standards sought in the field of healthcare, this Court concludes that the license revocation required by § 2105-165 constitutes a civil sanction, not a criminal punishment. Thus, the Court determines that Plaintiff does not have a chance of success on the merits of his double jeopardy claim.

### 4.    *Ex Post Facto Clause*

Plaintiff also maintains that § 2105-165(a) is an unconstitutional *ex post facto* law. The *Ex Post Facto* Clause prohibits retroactive punishment. U.S. CONST. art. I, § 9, cl. 3. The Supreme Court has held that "the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood,* 497 U.S. 37, 41 (1990); see also *O'Grady v. Village of Libertyville,* 304 F.3d 719, 723 (7th Cir. 2002). In other words, the Clause "is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dept. of Corrections v. Morales*, 514 U.S. 499, 505 (1995) (citations and quotations omitted). "[T]wo critical elements

must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). The *ex post facto* clause applies only to criminal laws. *Harisiades v. Shaughnessy*, 342 U.S. 580, 594 (1952) ("It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment."); *O'Grady*, 304 F.3d at 723. The Supreme Court has emphasized the restriction to penal statutes and thus a civil statute "will implicate ex post facto concerns only if it can be fairly characterized as punishment." *U.S. v. Leach*, 639 F.3d 769, 772 (7th Cir. 2011) (quoting *Bae v. Shalala*, 44 F.3d 489, 492 (7th Cir. 1995)).

As previously discussed, the Court does not believe that § 2105-165(a) is retroactive because it only targets conduct (holding a license and practicing medicine) undertaken after its enactment. See also *Leach*, 639 F.3d at 773 ("SORNA merely creates new, prospective legal obligations based on the person's prior history"). It does not penalize Dr. Bhalerao for the past ten years; rather, it bars him going forward. Furthermore, for § 2105-165(a) to violate the *Ex Post Facto* Clause, it must be both retrospective and penal. *Id.* Yet it is not a law that falls into one of the traditional categories of prohibited criminal laws. The clear intent of § 2105-165(a), whether it achieves that intent or not, is to protect the public health, safety, and welfare. See, *e.g., Smith v. Doe*, 538 U.S. 84 (2003) (finding the Alaska Sex Offender Registration Act is designed to protect the public and is non-punitive in nature); *Hawker*, 170 U.S. 189 (holding that criminal conviction can be used by State as evidence of a lack of good character and basis to revoke medical license, and law regarding same is not *ex post facto*). Thus, Plaintiff has no likelihood of success on his *ex post facto* argument.

    5.     *The Contracts Clause*

Plaintiff next contends that the Contracts Clause prohibits the "retroactive application of the Sex Offender Act" to Plaintiff. The Contracts Clause provides that "No State shall * * * pass any * * * Law impairing the Obligations of Contracts." U.S. Const. Art. I, § 10. First, it is debatable whether the 2002 Order meets the required elements of a contract under Illinois law. Although Plaintiff and the Disciplinary Board had previously entered a stipulation recommending settlement to the IDFPR's Director, it was not binding on the IDFPR. The Director issued the 2002 Order, and Plaintiff, who did not sign the order, was not a party to that order but was required to follow its dictates. But even if the 2002 Order were a consent order, Plaintiff's argument still fails. The Contracts Clause notwithstanding, contractual rights remain subject to the police power of the state. See *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) ("It is to be accepted as a commonplace that the Contracts Clause does not operate to obliterate the police power of the States") (quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934)); *Lincoln Towers Insurance Agency, Inc. v. Boozell,* 684 N.E.2d 900, 903-04 (1997); see also *Commonwealth Edison Co. v. Illinois Commerce Com'n*, 924 N.E.2d 1065, 1086-88 (Ill. App. Ct. 2d Dist. 2009). The state always retains the authority to safeguard the interests of its citizens. *Sanelli v. Glenview State Bank,* 483 N.E.2d 226 (1985). Put differently, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357 (1908).

Here, the legislature enacted § 2105-165 for the purpose of protecting the public from health care professionals, who, like Plaintiff, have been convicted of batteries against their

patients and certain other crimes. The legislature determined that the discretionary provisions of the Medical Practice Act were insufficient to serve the public and that mandatory revocation was required for health care professionals convicted of those crimes listed in § 2105-165(a). Accordingly, the legislature exercised its police power to protect the public. Plaintiff has not met his burden of demonstrating that the Court should substitute its judgment for the Illinois General Assembly in these circumstances or that he has any prospect of success on the merits of a Contracts Clause claim in light of the cases discussed above.

### 6. *Statute of limitations*

Plaintiff also argues that the five-year statute of limitations in § 22 of the Medical Practice Act, 225 ILCS 60/22, bars the revocation of his medical license under § 2105-165(a) because the IDFPR disciplined him based on his criminal conviction more than five years ago. Under Illinois law, to determine whether a statute of limitations applies to § 2105-165(a), the Court must determine whether the General Assembly intended a particular limitations period to apply. See *People ex rel. Dept. of Labor v. K. Reinke, Jr. and Company/Reinke*, 746 N.E.2d 12, 15 (Ill. App. Ct. 1st Dist. 2001). "In addition to the language chosen by the legislature, the court should consider the reason for the law, the evil to be remedied, and the purpose to be obtained thereby." *Id.* "Legislative intent is best evidenced by the language used by the legislature, and where an enactment is clear and unambiguous a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, *limitations* or conditions that the legislature did not express." *Kraft, Inc. v. Edgar*, 138 Ill.2d 178, 189 (1990) (emphasis added). While the State may be at times bound by statutes of limitations, Illinois courts consider the nature of the right sought to be asserted in determining whether a statute of limitations applies to the State when the statute does not specify a limitations period. *Reinke*, 746 N.E.2d at

15. "[T]he determination whether a government's action is immune from a statute of limitations depends on whether the right sought to be asserted is a right belonging to the 'general public' rather than to the government or to 'some small and distinct subsection of the public at large.'" *Id.* at 16 (citing *City of Shelbyville v. Shelbyville Restorium, Inc.*, 451 N.E.2d 874 (1983)).

Here, there is no indication that the General Assembly intended that the statute of limitations set forth in the Medical Practice Act to apply to the newly enacted section of the Civil Administrative Code. The language of both enactments refutes this theory. First, in relevant part, the statute of limitations in the Medical Practice Act states that "all proceedings to suspend, revoke, place on probationary status, or take any other disciplinary action as the Department may deem proper, with regard to a license on any of the foregoing grounds, must be commenced within 5 years next after receipt by the Department of a complaint alleging the commission of or notice of the conviction order for any of the acts described herein." 225 ILCS 60/22(A). By its terms, this statute of limitations applies only to "proceedings to * * * revoke * * * with regard to a license *on any of the foregoing grounds*." 225 ILCS 60/22(A). Because this limitations period relates specifically to discretionary disciplinary actions taken by IDFPR against medical licensees under § 60/22(A) of the Medical Practice Act, it is limited by its terms to only those actions.

Second, the placement and terms of § 2105-165(a) indicate that the General Assembly did not intend the limitations period for the Medical Practice Act to apply to actions under § 2105-165. The General Assembly placed § 2105-165 in the Civil Administrative Code, not in the Medical Practice Act, and § 2105-165 does not incorporate any statute of limitations, including the limitations period set forth in the Medical Practice Act. Rather, § 2105-165(a) requires permanent revocation of licenses of health care professionals who have committed the

listed offenses without a hearing and "*notwithstanding any other provision of law to the contrary*." 20 ILCS 2105/2105-165(a) (emphasis added).

Because it does not incorporate a statute of limitations and asserts a public right, § 2105-165 is consistent with legislative enactments that are not intended to have a statute of limitations. See *Reinke*, 746 N.E.2d at 15-17 (determining that catchall five-year statute of limitations in the Code of Civil Procedure did not apply because action brought under § 12(b) of the Act "asserts a right belonging to the general public" and "[t]he legislature likely believed that an action by a State agency to enforce compliance with a wage law involved a public right and was immune from statutes of limitation."). Like the *Reinke* statute, § 2105-165 does not incorporate a limitations period and asserts a public right of protection against health care workers that have been convicted of certain crimes. In short, for all of these reasons, the five-year statute of limitations in § 22 of the Medical Practice Act does not bar the revocation of Plaintiff's medical license under § 2105-165(a) of the civil Administrative Code, and Plaintiff's arguments to the contrary cannot succeed.

### 7. Res judicata

Plaintiff's final contention is that *res judicata* prevents the revocation of his license, presumably because the available relief under § 2105-165(a)—mandatory license revocation—is among the forms of relief available under the Medical Practice Act. The applicability of *res judicata* rests on three elements: "(1) an identity of the parties or their privies; (2) identity of the cause of action; and (3) a final judgment on the merits." *Prochotsky v. Baker & McKenzie,* 966 F.2d 333, 334 (7th Cir.1992); see also *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008). *Res judicata* applies to administrative hearings if "the administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it where the parties have

had an adequate opportunity to litigate." *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422 (1966); see also *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107-08. However, courts have applied *res judicata* much more flexibly in the administrative context. See, *e.g.*, *Alvear-Velez,* 540 F.3d at 677; *Int'l Harvester Co. v. OSHA,* 628 F.2d 982, 986 (7th Cir.1980) ("This court does not adhere to a rigid view of the doctrine in the administrative context."); see also *Collins v. Pond Creek Mining Co.,* 468 F.3d 213, 229 n. 3 (4th Cir.2006) ("[R]es judicata of administrative decisions is not encrusted with rigid finality that characterizes the precept in judicial proceedings."); *Bravo-Pedroza v. Gonzales,* 475 F.3d 1358, 1359 (9th Cir. 2007); *Sharp Kabushiki Kaisha v. Thinksharp, Inc.,* 448 F.3d 1368, 1372 (Fed. Cir. 2006); *Facchiano v. U.S. Dep't of Labor,* 859 F.2d 1163, 1167 (3d Cir. 1988).

In *United States v. Fisher*, the Seventh Circuit found that *res judicata* did not bar agency action under statutory amendments that conflicted with a prior consent decree. 864 F.2d 434, 439 (7th Cir. 1988). The court noted that the Superfund amendments under which that suit was filed were enacted four years after the consent decree was signed, and that the amendments directed the EPA in no uncertain terms to take peremptory steps to protect the public health. The court then concluded that the EPA had "no authority to refuse to enforce the statute just because its staff made commitments before Congress spoke." 864 F.2d at 439. As *Fisher* suggests, in determining whether the doctrine of *res judicata* should be applied with less rigidity than usual, courts have placed great weight on the identity of the institution of government responsible for the change in law. "Notably, although changes in case law almost never provide a justification for instituting a new action arising from the same dispute that already has been litigated to a final judgment, statutory changes that occur after the previous litigation has concluded may justify a

new action." *Alvear-Velez v. Mukasey*, 540 F.3d 672, 678 (7th Cir. 2008); see also *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398-99 (1981); *Fisher,* 864 F.2d at 439.

Here, even if the IDFPR's 2002 Order were considered a "consent decree,"[4] § 2105-165(a) requires "in no uncertain terms" that health care workers who have been convicted of criminal battery against patients will lose their licenses by operation of law. The General Assembly has altered the landscape, and, under the new regime, the IDFPR does not have the authority to refuse to enforce § 2105-165(a). After the passage of § 2105-165(a), a person convicted of criminal battery against a patient is no longer allowed to hold a license to practice medicine; mandatory revocation is no longer one of several consequences that can be applied—it is the only permissible course for the IDFPR. This statutory change created a course of action which was unavailable during the disciplinary proceedings in 2002: The IDFPR could not have brought an action under § 2105-165(a) *mandating* revocation in the prior disciplinary action because § 2105-165(a) had not yet been enacted. See *Alvear-Velez*, 540 F.3d at 678. Moreover, because "[t]he relevant change in the law here is statutory in nature, as opposed to a change in case law, and that change is being applied in the administrative context" (*id.* at 680), the arguments for applying *res judicata* are less persuasive. In sum, under the case law cited above, application of *res judicata* would not be appropriate in the circumstances of this case because it (i) would be inconsistent with the newly enacted legislation and (ii) would frustrate the General Assembly's decision to mandate the revocation of medical licenses of health care workers convicted of certain offenses.

---

[4]    As previously noted, whether the 2002 order can be considered a "consent decree" is a debatable proposition. See *supra* pp. 23-24.

**III.     Conclusion**

For the reasons set forth above, the Court concludes that Plaintiff has not shown a likelihood of success on the merits.   Therefore, the Court denies Plaintiff's motion for a preliminary injunction.

Dated:  November 29, 2010                    _____
                                             Robert M. Dow, Jr.
                                             United States District Judge